# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 5842 | **DATE** | 9/30/2002 |
| **CASE TITLE** | SENIOR INDUSTRIES, INC. vs. THOMAS & BETTS CORPORATION, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The Court grants T & B's summary judgment motion on noninfringement of of Senior's '960 and '074 patents as to the 40-2000X products is granted [129-1]. The Court grants T & B's motion for summary judgment as to noninfringement of the SC51 products as to Senior's '960 patent [123-1]. The Court denies T & B's motion for summary judgment as to unenforceability of the two patents based upon alleged inequitable conduct [132-1] and grants Seniors cross motion dismissing the inequitable conduct defense [157-1]. This case is hereby terminated and any pending motions stricken as moot. This is a final and appealable order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | SEP 3 0 2002 | | |
| ✓ | Docketing to mail notices. | | date docketed | | 181 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| | | U.S. DISTRICT COURT CLERK | date mailed notice | | |
| CG | courtroom deputy's initials | 02 SEP 30 PH 4: 19 | | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SENIOR INDUSTRIES, INC. )
)
    Plaintiff/Counter-Claim Defendant, )
)
                **v.** )    98 C 5842
)
THOMAS & BETTS CORPORATION, )    Judge Guzmán
DIAMOND COMMUNICATIONS PRODUCTS )
INC. and SACHS COMMUNICATIONS, INC., )
a/k/a/ SACHS WORLDWIDE COMPANY )
)
    Defendants/Counter-Claim Plaintiffs. )

## MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Senior Industries, Inc. ("Senior") brought this patent infringement action against

Thomas & Betts Corporation, Diamond Communications Products, Inc. and Sachs

Communications, Inc. a/k/a Sachs Worldwide Company ("T & B"), alleging that T & B

infringed Senior's Patents Nos. 4,993,960; 5,006,074 and 5,160,271 ("'960, '074, and '271

patents" respectively). T & B filed an amended answer and counterclaim seeking a declaratory

judgment of invalidity and unenforceability of the '960, '074, and '271 patents and raising an

affirmative defense of laches and estoppel.

All three of these patents describe electrical grounding clamps that attach to a metal

electric meter box/enclosure with the capability to provide a mechanical and electrical

connection to the meter box. This electrical connection is to provide an expedient grounding



means for a telephone interface box/ enclosure. The asserted patents by Senior and the accused infringing T & B products provide an economical way to ground a building's auxiliary residential electrical systems, such as telephone systems, through an existing grounding system established for the building's main electrical service. Normally the main electrical system is grounded through a dedicated grounding rod or connected to the residential water service piping, provided that it is electrically conductive. Alternatively, the telephone service could provide its own dedicated grounding rod or direct connection to the water piping system.

Senior's '960 and '074 patents are asserted against two of T & B's product lines. Specifically, Senior asserts the T & B's (Diamond Industries, Inc.) "40-2000X METER BOX GROUND CLAMP" (hereinafter "40-2000X products"), which are available in a series of sizes, and T & B's "SC51 BONDING AND GROUNDING HARDWARE" (hereinafter "SC51 products"), which are available in a variety of configurations, infringe the patents. The SC51 product line allegedly infringes only the '960 patent.

Summary judgment was previously granted in T & B's favor on non-infringement of T & B's 40-2000X grounding clamps as to Senior's '271 Patent. *Senior Industries, Inc. v. Thomas & Betts Corp.*, No. 98 C 5842, 2001 WL 1155248 (Guzman, N.D. Il. Sept. 28). T & B has now filed three more motions for summary judgment. Senior has filed a cross motion for partial summary judgment dismissing T & B's inequitable conduct counterclaim.

In the first motion for summary judgment, T & B claims that its accused 40-2000X products do not infringe Senior's '960 and '074 patents. In the second motion for summary judgment, T & B claims that its accused SC51 bonding connectors do not infringe Senior's '960 patent. In the third motion for summary judgment, T & B seeks to have both the '960 and the '074 patents declared unenforceable based on Senior's alleged inequitable conduct.

2

Senior cross moves for partial summary judgment on T & B's inequitable conduct claim. Each of these motions will be addressed in turn.

## DISCUSSION

Summary judgment is proper when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment is only appropriate when reasonable persons applying the proper legal standards cannot differ in their responses to the questions presented. *Techsearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed.Cir.2002). The plaintiff bears the burden of proving infringement by a preponderance of the evidence in a patent infringement action. *Laitram Corp. v. Rexnord, Inc.*, 939 F. 2d 1533 (Fed. Cir. 1991). With respect to infringement determinations, summary judgment is appropriate where the patent owner's proof does not show that at least one of the claims of the patent has been infringed. *Techsearch*, 286 F.3d at 1373.

A patent infringement analysis involves a two-step process: determining the proper construction of the asserted claim and analyzing whether the accused product infringes the asserted claim as properly construed. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). In the second step, the trier of fact determines whether the claims as thus construed read on the accused product. *Id.* Infringement can be proven literally or under equivalence. *Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1222 (Fed.Cir.1996).

To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F. 2d 792, 796 (Fed. Cir. 1990). Infringement can also be proven if the accused product has an equivalent structure. Two related tests are set forth for determining infringement of an equivalent structure. The first

3

test for determining infringement of an equivalent structure is the Doctrine of Equivalents. The purpose of the Doctrine of Equivalents is to prevent competitors from duplicating the essence of an invention while narrowly avoiding the literal language of the patented claims. *Laitram Corp. v. Cambridge Wire Cloth Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991). The Doctrine of Equivalents is intended to prevent a competitor from making merely insubstantial changes but is not intended to punish legitimate designing around the patent claims. *London v. Carson Pirie Scott & Co.,* 946 F.2d 1534, 1538 (Fed. Cir. 1991). The court, though, must be careful not to allow the application of the Doctrine of Equivalents to create a broad range of equivalents such that it would effectively eliminate an element in its entirety. *Id.* The equivalence standard requires a determination of whether the accused product performs a substantially similar function to produce a substantially similar result in a substantially similar way as the element of the claim. *Id.*

The second test for infringement of an equivalent structure is under 35 U.S.C. § 112, paragraph 6. "In order for an accused structure to literally meet a Section 112, paragraph 6 means-plus-function limitation, the accused structure must either be the same as the disclosed structure or be a Section 112, paragraph 6 'equivalent', i.e., (1) perform the identical function and (2) be otherwise insubstantially different with respect to the structure." *Kemco Sales, Inc. v. Control Papers, Co.*, 208 F.3d 1352, 1364 (Fed.Cir.2000). The accused product is "insubstantially different" if it performs an identical function to achieve a substantially similar result in a substantially similar way. *Kemco* at 1364.

The Doctrine of Equivalents test and the Section 112 test are closely related. The Doctrine of Equivalents requires performance of a "substantially similar function" rather than an

4

identical function as is required under Section 112. Moreover, literal infringement under the Section 112 equivalent structure standard requires the existence of an equivalent structure at the time of the patent issuance while equivalent structures arising after patent issuance may be evaluated under the Doctrine of Equivalents. *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320 (Fed.Cir.1999). With these principles in mind we turn to the parties' arguments.

This court previously construed all the disputed claims of the '960 and '074 patents in its *Markman Ruling. See Senior Industries, Inc. v. Thomas & Betts Corp.*, No. 98 C 5842, 2001 WL 1164165 (Guzman, N.D. Ill. Sept. 28). The first step of the infringement analysis having been completed, we now move into the second step of comparing the properly constructed claims to the products accused of infringing.

## I.

### T & B's MOTION FOR SUMMARY JUDGEMENT OF NON-INFRINGEMENT OF U.S. PATENT NOS. '960 AND '074 BY THE ACCUSED T & B 40-2000X PRODUCTS

#### (A) '960 PATENT

The '960 patent entitled "Grounding System and Clamp," was issued on February 19, 1991. Senior alleges that the accused 40-2000X products infringe Claims 1, 2, 4, 5, 8, 10, 11, 13, and 14 of the '960 patent. Because Claims 1, 4, and 10 are independent claims we analyze the parties arguments as to these claims first. If devices do not infringe independent claims, they do not infringe corresponding dependent claims. *See Streamfeeder, LLC v. Sure-Feed Sys. Inc.*, 175 F.3d 974, 984 (Fed. Cir. 1999); *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 (Fed.Cir.1989) (dependent claims of independent claims can be infringed even if the independent claim is not infringed but not the converse).

5

## I. CLAIM 1 OF THE '960 PATENT

T & B argues that their 40-2000X grounding clamps do not infringe the asserted Claim 1 of Senior's '960 patent either literally or under the doctrine of equivalents. The parties' dispute over Claim 1 concerns the "clamping device," "securing means," and "telephone system" limitations of the claim. Familiarity with the claim construction will be assumed, but the pertinent facts will be summarized herein.

Claim 1 of the '960 patent has been construed as "a clamping device connected to the utility box and having securing means for penetrating the outer surface of the utility box without penetrating the inside of the utility box" to ground a "telephone system." *Senior Ind. Inc. v. Thomas & Betts,* 98 C 5842, 2001 WL 1164165, (Judge Guzman, N.D. Ill. at ** 6-7, Sept. 28). Hence, Claim 1 requires a "clamping device" with "securing means" for grounding a "telephone system." *Id.*

Elements [e], [f], and [g] of Claim 1 were previously construed by this court in its *Markman Ruling. Id.* ** 12,15,17. Element [e] of Claim 1, "clamping device," was held by this court to have vague and ambiguous terms insufficient for one skilled in the art to ascertain what Senior was precisely claiming. Thus, although an element of a claim should normally have its broadest meaning, the claim was interpreted according to the patent's specification and its history. This court thus construed "clamping device" to be "an elongated C-shaped clamp wherein the base is longer than one of the sides of the hollow metal box enclosure and having a pair of opposed arms so that the arms are connectable to the box on opposite sides of the box. The base of the clamp is substantially longer that [sic] the arms." *Id.* at *12. The specification did not disclose evidence of a base member with more than one piece, and the application for the

6

'074 patent with two base members provided further evidence that Senior only had one piece in mind with respect to this element. *Id.* at *18. Hence, this court restricted the base to a single member.

Element [f] of Claim 1, "securing means," utilizes means-plus-function language. A means-plus-function claim recited in general terms is a "means" for performing a precisely stated "function" without identifying the particular structure, material, or acts of the claimed invention. Thus, the scope of a means-plus-function claim is strictly limited to the "corresponding structure, material, or acts" described in the specification, and equivalents of that structure. *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1347 (Fed. Cir. 1999).

The structure linked to the "securing device" in the '960 patent specification describes a threaded bolt with a special end surface to form the mechanical and electrical connection to the metal box. The preferred embodiment described in the patent specification is a threaded bolt with a pointed center extending past the end surface to prevent the clamp from walking. The outer edge of the surface has an abrading surface to grind through any non-conducting surface on the metal box. *Id.* at *13. The specification further clarifies the preferred embodiment but does not offer an alternative embodiment; thus, this court followed the interpretation given by T & B. A similar analysis to the interpretation of "clamping device" was followed in construing the claim based strictly on the preferred embodiment and specification. This court thus construed "securing means" to be "a bolt positioned within an opening in an arm extending outwardly from the elongated base member, the bolt having two distinct structures, an abrasive end surface that has been formed with sufficient roughness to grind through the surface of the metal utility box

7

and a cone-shaped center point for penetrating the outside of the utility box without penetrating the inside of the utility box." *Id.* at *15.

With respect to element [g] or the "second electrical conductor element," this court followed the plain language in construing its meaning. The element specifically gave reference to a "telephone system." The specification did not list or suggest other systems to which the clamp could be applied. Furthermore, the interpretation offered by Senior, a "system of grounding," was held to be vague at best. This court thus strictly construed "telephone system," element [g] of Claim 1, to what was claimed, specifically, telephone systems only and not Community Antenna Television ("CATV") systems. *Id.* at *17.

### (A.) ELEMENT E-LITERAL INFRINGEMENT

Senior does not dispute that the "clamping device" limitation found in element [e] is not literally met by the two-piece construction of the T & B's 40-2000X products. (Senior's Opp. Def.'s Mot. Summary Judgment, at 3). The T & B's 40-2000X products all include a two-piece construction while Senior's product is limited to a one-piece base.

### (B.) ELEMENT E- UNDER THE DOCTRINE OF EQUIVALENCE

Turning to the doctrine of equivalents this court also concludes that the two-piece T & B product, while accomplishing the same function, does so in a manner different than the manner claimed in the '960 patent. The way in which the T & B's products function with a two-piece base clamp to the metal box enclosure cannot be concluded to be substantially similar to the one-piece clamping device defined in Claim 1.

Senior's one-piece base is not adjustable and requires a range of differently sized bases to accommodate the different sized metal enclosures to which it is to be attached. The T & B 40-

8

2000X products provide two L-shaped members having structure on each member to allow the base to be adjusted to four discrete sizes to accommodate different-sized metal enclosures. To accomplish the adjustable function, one L-shaped member includes a series of spaced apart keyholes and the other L- shaped member includes a pair of spaced apart rivet-like structures. The length of the base is adjusted by inserting different rivet-like structures in different spots. Accordingly, the structural elements of the T & B's 40-2000X adjustable products can only be concluded to work in a different way from Senior's one-piece product. The added adjustability and sliding keyhole system do not perform a similar function as the one-piece base in a similar way. Therefore, no infringement can be found as to element [e] under the Doctrine of Equivalents.

### (C.) ELEMENT F-LITERAL INFRINGEMENT

Senior argues that the "securing means" of the T & B's 40-2000X product literally infringes the "securing means" element of the '960 patent. Because this element is written in a means-plus-function format, infringement is analyzed under the means-plus-function test below.

### (D.) ELEMENT F-UNDER THE DOCTRINE OF EQUIVALENTS

This court previously construed "securing means" to be "a bolt positioned within an opening in an arm extending outwardly from the elongated base member, the bolt having two distinct structures" to "grind through" the surface of the box and penetrate the outside surface of the box. *Id.* at *15. The "securing means" language of the claim refers to the function of connecting two elongated members of the clamp together. The scope of the means plus function claim is limited to the function recited in the claim and the structure, material, or acts described

9

in the specification that correspond to the means for performing that function. *Kemco Sales Inc. v. Control Papers Co.* 208 F. 3d 1352, 1360 (Fed. Cir. 2000).

T & B contends that the end surfaces of its 40-2000X products do not contain the necessary second structure– a surface to abrade the outer surface of the box–of the securing means. This court agrees that the way in which the 40-2000X products secure to the metal enclosure is not equivalent to the "way" in which the clamp is secured as set forth in Claim 1, element f of the '960 patent. T & B points out that the conical point prevents "walking" while tightening the clamp and argues that the accused products create a ground by piercing the outer surface of the metal box using a threaded bolt with a smooth rather than abrading point and end surface. T & B further argues that the surrounding end surface does not even contact the box and thus cannot abrade the surface.

In response, Senior has provided photographs depicting a scratching of the surface by the end of the bolt. Furthermore, T & B claims that the fact that the surrounding end surface is designed to "prevent the undesirable penetration of the exterior of the box" supports the conclusion that the end surface is designed to contact or abut the box exterior. Otherwise, the end surface structure of the bolt would not make a difference and T & B's contention that the surface prevents penetration would have no value.

The court does not find the issue of contact with the box exterior important to the overall analysis. The court agrees with T & B that the evidence of scratching does not provide any evidence of a surface with sufficient roughness to abrade the box surface. The end surface provided by the claim, as evidenced by Senior's products, looks more like a serrated surface of a mechanical grinder. The end surface of the 40-2000X product, on the other hand, is designed

10

specifically with a smooth surface to avoid abrading the box exterior and stops the bolt from piercing the box completely. Evidence of scratching of the surface by the 40-2000X products does not show that the securing means has an abrading effect to the surface of the box. The scratching of the exterior of the box appears to be the natural consequence of the application of a high force to the bolt and box and not equivalent to that of abrasion. Under substantial force, any surface structure would eventually scratch the exterior of the metal enclosure even if it is designed to have as little friction as possible like the 40-2000X products. The photographic evidence of scratching does not rebut the logical conclusion that a machine-smoothed surface is not equivalent to an abrading surface. Furthermore, the 40-2000X may slightly scratch the surface, but they do not scrape away and abrade the surface of the enclosure. Thus, the way in which the 40-2000X products secures to the metal enclosure cannot be concluded to be equivalent.

### (E.) ELEMENT G-LITERAL INFRINGEMENT

T & B next argues that two out of the four accused products do not infringe Claim 1 of the '960 patent because they are intended for use with CATV systems only. This court previously construed Claim 1 to be restricted to a system for grounding telephone systems. *Id.* at *17. The 40-20000 and 40-20001 products are designed for use with wires typically used to ground CATV systems. This court agrees that these accused products do not literally infringe Claim 1 of the '960 patent. Grounding systems for CATV systems are not identical to grounding systems for telephone systems. The grounding systems themselves are designed differently depending on what type of electrical system must be grounded. Therefore, no literal infringement can be found.

11

## (F.) ELEMENT G-UNDER THE DOCTRINE OF EQUIVALENTS

Senior argues that a grounding system for a CATV system is substantially equivalent to a grounding system for a telephone system, because both are clamping systems that provide a ground. Both systems do provide a ground, but a grounding system for a CATV system is not necessarily equivalent to that of a telephone system. A grounding system for a telephone system typically utilizes a higher capacity grounding wire. The two accused products in question have been designed specifically to accommodate a different size wire. The accused CATV products thus do not function in substantially the same way, because they have been designed with a different structure to accommodate grounding of a CATV system.

Senior in effect argues that the accused products are equivalent because both the accused products and the claim provide systems for grounding in general. Grounding systems existed prior to the invention by Senior, and Senior intentionally limited its claim in order to patent its invention. The patent clearly could not be held to cover the grounding of any and all possible electrical systems especially given its restriction to telephone systems by the claim itself.

As previously discussed, the Doctrine of Equivalents and Section 112, paragraph 6, are intended to prevent a competitor from making merely insubstantial changes but is not intended to punish legitimate designing around the patent claims. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534 (Fed. Cir. 1991). The court must not allow the application of the Doctrine of Equivalents to create a broad range of equivalents such that it would effectively eliminate an element in its entirety. *Id.*

This court has already construed the claim to be specifically restricted to telephone systems and not CATV systems, and Senior may not seek to broaden the claim to other

grounding systems by utilizing the equivalence standard for infringement. Senior is responsible for the claim language and may not broaden the claim by asserting a broader interpretation here. Therefore, it can only be concluded that T & B' accused products– 40-20000 and 40-20001–designed for grounding CATV systems do not infringe the '960 patent.

Two of the accused products, 40-20000 and 40-20001, do not infringe Claim 1 based upon their grounding of CATV systems. As to the remaining accused products, none of the accused products infringe elements[ e], [f], [g] and [ h].[1] Therefore, it cannot be concluded that Claim 1 the '960 patent is infringed by the accused T & B products.

## II. CLAIM 4 OF THE '960 PATENT

Claim 4 of the '960 patent is substantially similar to Claim 1, except that elements [e] and [f] provide a more detailed description of the "securing means" and "clamping device." The prosecution history reveals that Claim 4 was originally a dependent claim on Claim 1 but was later modified to be an independent claim that provides a more detailed structure for the "clamping device" element and deletes the "securing means" language in favor of more detailed language.

For the same reasons as set forth above, two of the accused products clearly do not infringe Claim 4, because they are designed for grounding CATV systems only. The infringement analysis thus turns on elements [e] and [f]--the elements detailing the clamping device and securing means.

The more detailed language of elements [e] and [f] only serve to narrow Claim 4 from Claim 1. Based on the claim construction by this court in the *Markman Ruling, Senior Ind. Inc.*

---

[1]Because element [h] has been construed to involve a ground mechanism for the electrical power system to a telephone system this element of Claim 1 is also not infringed.

*v. Thomas & Betts,* 98 C 5842, 2001 WL 1164165 (Guzman, N.D. Ill.), elements [e] and [f] of Claim 4 cover a similar but narrower structure than the corresponding elements of Claim 1. *Id.* at *10.

For the same reasons as set forth in our analysis with respect to Claim 1, the T & B's products do not literally infringe element [e] of Claim 4 because they do not include a one-piece elongated base member. Likewise, as set forth in Claim 1, the way in which the 40-2000X products attach to the enclosure with a two-piece, adjustable structure is not substantially similar to the one-piece, non-adjustable structure of the claim. Thus, no infringement can be found as a matter of law as to element [e] of Claim 4.

For the same reasons as set forth in Claim 1, the T & B's products do not literally infringe element [f] of Claim 4 because they do not include an abrasive end surface. The accused products have a mechanically smoothed end surface unlike the abrasive surface called for in the claim. Additionally, as set forth in Claim 1, Senior's claim of infringement as to element [f] under the doctrine of equivalents fails to satisfy the function-way-result test requiring the accused product to act in substantially the same way as the claim element. The 40-2000X products perform a substantially different function than the claim. The 40-2000X products have a smooth end surface to prevent penetration of the surface whereas the claim has an "abrasive end surface for abutting and abrading the outer surface of the box" or its equivalent. The 40-2000X bolt thus creates the electrical connection in a substantially different way than the claim and does not infringe element [f] Claim 4.

### III. CLAIM 10 OF THE '960 PATENT

Infringement of Claim 10 turns on the same elements as discussed in Claims 1 and 4; therefore, the analysis of Claim 10 would be the same as that of Claims 1 and 4. The 40-2000X products do not include an "elongated base being substantially longer than the length of the arms" or its equivalent. The 40-2000X products also do not include the "first means" and second means" or their equivalents.

#### (A.) CLAIM 10 ELEMENT B

For the same reasons as set forth in Claim 1, the 40-2000X products do not infringe element [b] of Claim 10. The claim calls for a one-piece elongated base, and the 40-2000X products have a two-piece base structure. The equivalence analysis for element [b] is identical to Claims 1 and 4; therefore, the 40-2000X products also do not function in the same way as element [b] of the claim.

#### (B.) CLAIM 10 ELEMENT D

Additionally, the 40-2000X products do not infringe element [d] of Claim 10 for the same reasons as set forth in Claim 1. The 40-2000X products do not include an identical, abrasive end surface as the claim. The 40-2000X products have a smooth end surface. The 40-2000X products also do not include the equivalent to an abrasive end surface. The end surface of the 40-2000X products are machined to be smooth "so that it will not grind" the surface and pass through. The 40-2000X products do not perform a substantially similar function of abrading the surface of the enclosure since they have a smooth end surface designed to have the least abrasive surface possible. Thus, the 40-2000X products do not infringe element [d] of Claim 10.

Therefore, for the reasons above and as set forth above under Claim 1, no infringement of Claim 10 can be found as a matter of law.

### III. DEPENDENT CLAIMS 2, 5, 8, 11, 13, 14

If devices do not infringe independent claims, they do not infringe corresponding dependent claims. *See Streamfeeder, LLC v. Sure-Feed Sys., Inc.*, 175 F.3d 974 (Fed.Cir.1999) (only narrowing the range of the dependent claim to avoid prior art is an exception to this "axiomatic principle"). Claim 2 is dependent on Claim 1. Claims 5 and 8 are dependent on Claim 4. Claims 11, 13, and 14 are dependent on Claim 10. The court, therefore, grants T & B's motion for summary judgment of noninfringement as to dependant Claims 2, 5, 8, 11, 13, and 14 on the basis of noninfringement of their respective, underlying, independent claims.

### IV. CONCLUSION

For the reasons set forth above, as a matter of law, no infringement of the '960 patent can be found. The Court, therefore, grants T & B's motion for summary judgment of noninfringement of the '960 patent by the 40-2000X products.

### (B) '074 PATENT

The '074 patent, entitled "Adjustable Ground Clamp," was issued on April 9, 1991. Senior alleges the accused products infringe Claims 1, 2, 3, 5, 6, 7, 8, 10, 11, 12, 15, 18, and 21 of the '074 patent. The court previously issued a *Markman Ruling* construing all the disputed claims of the '074 patent. *See Senior Industries, Inc. v. Thomas & Betts Corp.*, 2001 WL 1164165 (Guzman, N.D. Ill.) at **14-22. Familiarity with the claim construction is assumed, but the pertinent facts will be summarized herein.

## I. CLAIM 1 OF THE '074 PATENT

Claim 1 of the '074 patent has similar language to the '960 patent but allows for an adjustable base with two members. Element [d] of Claim 1 provides a "threaded bolt having an abrading surface" to penetrate the outer surface of the box. T & B argues that element [d] should have been limited to the construction given in Claim 4 of the '960 patent, but unlike the '960 patent, the language of Claim 1 of the '074 patent did not contain sufficient structure to construe the meaning of the "threaded fastener" element. The element was not claimed as a means-plus-function format; therefore, this court limited the construction to the preferred embodiment according to the interpretation offered by Senior.

Element [e] provides "adjustment means" for adjusting the length of the base within a "predetermined range of lengths by securing the member to each other at a plurality of different positions." Element [e] was claimed in a means-plus-function format; therefore, this court limited the construction to the structure disclosed in the specification. The "adjustment means" was interpreted to be any means for releasing the members, such as clips and the like, which secure the elongated members together at varying positions depending on the width of the conductor. The method for securing the members can include clips or another threaded hole in place of the tab given in the specification as long as it would be apparent to one skilled in the art.

### (A.) CLAIM 1 ELEMENT D-LITERAL INFRINGEMENT

Element [d] of Claim 1 of the '074 patent includes substantially similar claim construction as the "securing means" from Claim 1 of the '960 patent. Element [d] of the '074 patent does not provide any basis for a different analysis than that given above for the '960 patent. The court,

17

however, does not need to focus on element [d] because the accused products clearly do not infringe element [e] of Claim 1.

## (B.) CLAIM 1 ELEMENT D-UNDER DOCTRINE OF EQUIVALENTS

The accused products do not contain an equivalent structure as the claim construction. Element [d] of Claim 1 calls for any method that would be obvious to one skilled in the art for securing the elongated members. The keyhole and rivet system is not the equivalent of a clip, bolt, or other fastener system. The "way" in which the accused products attach the elongated members is not equivalent to the way in which the claim calls for attaching the members. The specification states that "alternate arrangements are possible so long as . . . [the securing means] keep the members in alignment once interconnected." *Patent '074, lines 26-29.* The accused products attach the elongated members using a sliding keyhole system in combination with the opposing forces of the enclosure once the clamp is in place to lock the members in place. The "way" a sliding keyhole system allows for adjustment is not substantially similar to the way the two fasteners secure the two members and allow adjustment as set forth in the claim.

Senior argues that the rivet and keyhole system is equivalent to the claim because the accused products have overlapping holes in the member with the rivets and allow the members to be secured together. Regardless of whether the holes through which the rivets are fastened would constitute holes in the sense of the claim, the rivets and keyholes are not equivalent to the claim construction. Unlike the claim, the second member is attached to the first by sliding the rivets into the keyholes. The sliding motion is not equivalent to a fastening action utilized by clips or bolts. Moreover, the accused products do not fasten the two members keeping them "interconnected" once they are aligned. The claim calls for a method that attaches the two

members together. The accused products have a system that keeps the members loose unless they are connected and an opposing force is applied to the arms on each member. When the rivets are passed through the keyholes, the members will not remain interconnected and aligned until the base is clamped to the box. The sliding keyhole systems essentially allows for adjustment by quickly choosing the desired length before attaching the members rather than choosing a length and fastening the members together at that length. The accused products thus do not allow for adjustment means in a similar way as element [e]; thus, no infringement can be found with respect to this element.

### (C.) CLAIM 1 ELEMENT E-LITERAL INFRINGEMENT

The "adjustment means" language of the '074 patent tracks the language of the '271 Patent for which the court has already granted summary judgment of noninfringement by the exact same products. *Senior Industries, Inc. v. Thomas & Betts Corp.*, 98 C 5842, 2001 WL 1164165 (Guzman, N.D. Ill. Sept. 28, 2001) at **2-6. The accused products do not literally infringe element [e] of Claim 1. Element [e] of Claim 1 calls for an "adjustment means . . . securing the members to each other at a plurality of different positions." This court interpreted "adjustment means" to include any reasonable connector to secure the elongated members together at varying positions. The claim covers clips, bolts, and screws for attaching the elongated members together. The accused products have protruding rods and a sliding keyhole system which clearly are not an identical structure.

### II. CLAIM 15 OF THE '074 PATENT

Claim 15 of the '074 patent calls for "adjustment means for interconnecting the overlapped elongated base members" and a "ground means . . . for abrading the adjacent side

surface" of the box to establish an electrical ground connection. This court construed element [d], the "adjustment means," according to the construction given Claim 1 of the same patent. The "adjustment means," therefore, would cover any reasonable means that could enable one skilled in the art to attach the base members together. Element [e], the "ground means," was construed according to the specification of the patent. Thus, "ground means" was interpreted to be a "threaded bolt positioned within a threaded opening in an arm extending outwardly form the elongated base member, the bolt having two distinct structures, an abrasive end surface that has been formed with sufficient roughness to ring through the surface of the utility box and a cone-shaped center point for penetrating the outside of the box without penetrating the inside of the utility box."

### (A.) CLAIM 15 ELEMENT D & E

Element [e] of Claim 15 presents the same issues as those discussed in Claim 1 of the '960 patent, but the court need not address element [e] because the accused products do not infringe element [d] of Claim 15. Element [d] has the same construction as that given in Claim 1. The analysis would thus be identical to that of Claim 1. For the same reasons as set forth above as to Claim 1, the court finds that element [d] of Claim 15 is not infringed by the accused products. The court, therefore, finds that summary judgment of noninfringement is proper as to Claim 15.

### III. DEPENDENT CLAIMS 2, 3, 5, 6, 7, 8, 10, 11, 12, 18, 21

Claims 2, 3, 5, 6, 7, 8, 10, 11, 12 are dependent on Claim 1. Claims 18 and 21 are dependent on Claim 15. For the reasons above, noninfringement has been found as to Claims 1

and 15. The court, therefore, grants T & B' motion for summary judgment of noninfringement as to dependant Claims 2, 3, 5-8, 10-12, 18, and 21.

## IV. CONCLUSION

For the reasons set forth above, as a matter of law, no infringement of the '960 patent can be found. The Court, therefore, grants T & B's motion for summary judgment of noninfringement as to the '074 patent by the 40-2000X products.

## II.

### DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT OF NONINFRINGEMENT OF U.S. PATENT NO. '960 BY THE ACCUSED T & B SC51 PRODUCTS

T & B's second motion for summary judgment seeks a declaration of noninfringment of its SC51 bonding connectors for meter pans as to Claims 1, 4, and 5 of the '960 patent. Senior alleges that T & B has infringed independent Claims 1 and 4 of the '960 patent.

The SC51 products are electrical grounding clamps that attach to a metal electric meter box/enclosure with the capability to provide a mechanical and electrical connection to the meter box. This electrical connection is to provide an expedient grounding means for a building's auxiliary residential electrical systems. The unique design, which mounts on the lip of the meter pan or the meter pan hub, provides a fixed and positive mechanical connection to a grounded meter box without interfering with the opening of the meter box front cover. The SC51 bonding connectors are available in several different styles and materials for a variety or applications. Some styles are for use with CATV systems while others are designed for use in telephone systems. The SC51-1 and 51-2 bonding connectors are triangular shaped and designed for attachment to a corner of the meter box. To install an SC51-1 or SC51-2 bonding

21

connector on a corner of the meter box, the bottom edges of the connector are placed under the bottom fold or lip of the meter box cover. A stainless steel mounting screw is provided on a top surface of the connector to secure it to the meter box cover. Each of the SC51-1 and SC51-2 bonding connectors are also available in stainless steel.

The SC51-1 and SC51-1SS connectors are designed for use in a CATV system and include a cup washer and nut arrangement to accommodate a #10-14 AWG copper ground wire. The SC51-2 and SC 51-2SS and SC 51-1BE connectors are designed for use in a telephone system. The SC51-2 and SC51-2SS include a slotted washer and nut arrangement to accommodate a #6 AWG copper wire ground. The SC51-1BE connector meets the Bellcore standard TRNW7-001075, the standard by which most telephone companies abide. The SC51-1BE bonding connectors is also triangular in shape and designed to attach to a corner of the meter box.

The SC-51-CF and the SC51-CF is designed for use in CATV system and can accommodate #10-14 AWG ground wire using a cup and a screw arrangement. Alternatively, the SC51-CF is provided with at least one through hole adjacent to the ground screw for engaging the ground wire to facilitate wrapping the wire beneath the screw head. The SC51-CF85 is designed for use in a telephone system and can accommodate up to a #6 AWG ground wire. The SC51-CF and SC51-CF85 bonding connectors are designed to attach to bottom fold or lip of the top front of the meter box. These connectors include a flange which fits behind the lip of the box and uses two screws to attach to the meter box.

The SC51-CF81 connector is designed for use in trailer park locations in a CATV system. No ground wire is used since connection to the grounded trailer park power pedestal

eliminates the need for a ground wire. Similar to the SC51-CF and SC51-CF85, the SC51-CF81 connector attaches to the bottom fold or lip of the meter box cover using a flange which fits behind the cover lip. The SC51-CF81 connector is also provided with a threaded coaxial connector mounted directly on a tab portion of the bonding connector.

Lastly, the SC51-TG bonding connector is designed for use in both CATV and telephone systems. The S 51-TG connector attaches to certain meter box hubs. The SC51-TG connector uses the screws which attached the hub to the meter box to mount the connector. Thus, the SC51-T6 does not include a separate attachment screw or bolt. Unlike the 40-2000X products, the SC51 products do not have a C-shaped based structure wherein the base is longer than one of the sides of the meter box and further include a pair of opposed arms that are connectable to opposite sides of the meter box. Each SC51 series connector is physically much smaller in dimensional size than any side of the meter box to which it is attachable. Instead, the SC51 products attach to the lip of the enclosure lid or the corners of the enclosure. The SC51 products have curved flanges for hooking onto the enclosure and a screw for fastening the product to the enclosure. All the SC51 products are composed of two pieces, both significantly smaller than the enclosure width, which locate at separate points on the enclosure. The ground connection with the box is established by similar means as the 40-2000X products.

## I. CLAIM 1 OF THE '960 PATENT

### (A.) CLAIM 1 ELEMENT E-LITERAL INFRINGEMENT

Claim 1 of the '960 patent is an independent claims that states:

[a] A system for grounding a telephone system and an electrical power system, comprising:

[b] an electric utility box for the electrical power system;

[c] a ground mechanism;

[d] a first electrical conductor connecting the ground mechanism to the utility box for electrically ground the utility box;

[e] a clamping device connected to a utility box;

[f] and having securing means for penetrating the outer surface of the utility box without penetrating the inside of the utility box; and,

[g] a second electrical conductor for connecting the clamping device to a ground connection for the telephone system,

[h] whereby the ground mechanism for the electric power system serves the dual purpose of grounding the telephone system.

The clamping device limitation was construed in this court's *Markman Ruling* as a one-piece elongated C-shaped clamp in which the base is longer than one side of the metal enclosure and includes a pair of opposed arms that are connectable to the box on opposite sides. *See Senior Industries, Inc. v. Thomas & Betts Corp.,*98 C 5842, 2001 WL 1164165 (Guzman, N.D. Ill. Sept. 28, 2001) at **11-12 and 17-18. It is undisputed that none of the T & B's SC51 series bonding connectors are C-shaped with an elongated base that is longer than one of the sides of the meter box to which it can be attached. Furthermore, none of the SC51 connectors include a pair of opposed arms connected to a base so that the arms are connectable to opposite sides of the meter box. These connectors are much smaller and are mounted on the lip of the meter box rather than across the meter box. Thus, the elongated base limitation and the opposed arms are not present and literal infringement cannot occur.

Moreover, for the same reasons stated earlier, two of the SC51 clearly do not infringe the claim. These two SC51products ground to cable systems and not to telephone systems. These products perform a different function than the function claimed in Senior's patent for the reasons stated regarding the 40-2000X products we find no infringement under the Doctrine of Equivalents.

24

## (B.) ELEMENT E-UNDER DOCTRINE OF EQUIVALENTS

We also conclude that the test for equivalency has not been satisfied and infringement is not present under this doctrine. The function as well as the way in which the accused clamps perform are different than the patents in question. The SC51 connectors attach to the meter box cover fold or lip at an edge. Both the lip mount clamps and the corner mount clamps lack the "clamping device" covered by element [e] of Claim 1 under the Doctrine of Equivalents.

The "clamping device" construction requires a single, elongated base with a C-shape and opposing arms. The court declines to accept Senior's argument that the accused structure has an equivalent structure by means of arms located opposite each other and clamping to the enclosure. The way in which the corner clamp clamps to the enclosure is significantly different than the claim construction. The accused products consist of two separate pieces that each clamp to the enclosure without opposing arms and thus do meet the "way" prong under the Doctrine of Equivalents. Alleging that the clamps even have a base member stretches the reasoning of the court; no reasonable interpretation of the accused structure allows for a determination that they contain an elongated base spanning the side of the enclosure.

The corner clamps fit to the shape of the corner of the enclosure and these clamps are shaped to hook onto the lip of the cover and fasten with a single screw. The corner shape of the accused products does not even remotely resemble a C-shaped, elongated base and are not anywhere near the length of a standard enclosure. Furthermore, the accused products do not have opposing arms but rather a hook shape and opposing screw. The corner clamps attach to the enclosure wherever the corners of the enclosure may be located and not where the alleged "base" member locates them. The "way" the accused products clamp to the enclosure is not equivalent.

Therefore, even under the Doctrine of Equivalents, the corner clamps do not infringe element [e] of Claim 1.

Moreover, the lip mount clamps are not an equivalent structure to element [e] of the claim. Similar to the corner mount clamps, the lip mount clamps contain a significantly different structure than a C-shaped, elongated base. The lip mount clamps also do not clamp to the box by way of opposing arms positioned by an elongated base longer than the length of the side. The lip mount clamps hook to one side of the lip and fasten to the other side with an opposing screw. The lip mount clamps also do not clamp by using a base with a C-shape and positioning opposing arms spanning one side of the box; therefore, the "way" the accused products clamp to the enclosure is not equivalent. The lip mount clamps attach at any point along the lip of the enclosure lid and not where the alleged "base" member locates them. The accused lip mount clamps, therefore, do not infringe element [e] of Claim 1.

Similar to its opposition to Defendants' motion as to the 40-2000X products, Senior argues that its evidence of known interchangeability is proof of equivalence. As explained above, the court takes into consideration evidence of known interchangeability but does not find it persuasive. In this matter, the court notes that given the substantial differences between the accused products and the claims, the evidence of one expert contending known interchangeability between products cannot override evidence otherwise weighing completely against a finding of equivalence.

The SC51 products that ground CATV systems do not infringe Claim 1 for the reasons set forth previously. Furthermore, none of the SC51 products infringe element [e], the "clamping

device" element, of Claim 1. Therefore, summary judgment of noninfringement is proper as to Claim 1 of the '960 patent.

## II. CLAIM 4

Claim 4 of the '960 patent is similar to Claim 1 except that element [e] of the '960 patent details the disputed "clamping device." The detailed description of Claim 4, if anything, serves only to narrow the interpretation given Claim 1. The infringement analysis under Claim 4 would thus be identical to that set forth for Claim 1. Likewise, the court finds summary judgment of noninfringement may be properly granted as to Claim 4.

## III. DEPENDENT CLAIM 5

Claim 5 is dependent on Claim 4. Summary judgment of noninfringement has been found as to Claim 4 of the '960 patent. The court, therefore, may properly grant T & B's motion for summary judgment of noninfringement as to dependant Claim 5.

## IV. CONCLUSION

For the reasons stated above the Court finds that no genuine issue of material fact exists as to infringement of the '960 patent by T & B's SC51products. The court, therefore, grants T & B's motion for summary judgment of noninfringement of the '960 patent by the accused T & B SC51 products.

## III.

### T & B's MOTION FOR SUMMARY JUDGMENT OF UNENFORCEABILITY OF SENIOR'S PATENT NOS. '960 AND '074 DUE TO ALLEGED INEQUITABLE CONDUCT AND SENIOR'S CROSS MOTION IN OPPOSITION TO ALLEGED UNENFORCEABILITY

T & B's final motion seeks a declaration that Senior's '960 and '740 patents are unenforceable due to alleged inequitable conduct. Individuals involved with filing and prosecuting a patent are required to prosecute patent applications in the United States Patent Office ("PTO") with candor, good faith, and honesty. *Li Second Family Ltd. P'ship v. Toshiba Corp.*, 231 F.3d 1373, 1378 (Fed.Cir.2000). During the application process, individuals involved in the application process have a duty to disclose material information known to them at any time until the claim is cancelled or withdrawn or the application is abandoned. 37 C.F.R. 10.23.

Inequitable conduct is a discretionary decision that may properly be made by the presiding judge, not the jury, on his or her own factual findings, albeit not on summary judgment if there is a genuine dispute. *Paragon Podiatry Laboratories, Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182, 1190 (*citing Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1211-13 (Fed.Cir.1987)). "Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995).

Generally, a finding of inequitable conduct requires a two-step process. First, threshold levels of materiality and intent must be found. *Ulead Sys., Inc. v. Lex Computer & Mgmt. Corp.*, 130 F. Supp.2d 1137, 1143 (Fed.Cir.2001). The burden is on the party moving

for unenforceability of the patent to prove materiality and intent by clear and convincing evidence. *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 872, (Fed.Cir.1998). Second, the court must balance the two levels to find inequitable conduct. *Id.* The court must determine if the conduct rises to the level of culpability to hold the patent unenforceable. *Ulead* 130 F. Supp.2d at 1143. The more material the information, the less evidence of intent will be required to find inequitable conduct. *N.V. Akzo v. E.I. Dupont de Nemours*, 810 F.2d 1148, 1153 (Fed.Cir.1987).

With regards to an adequate pleading of a "failure to disclose," the moving party must allege: (1) material prior art; (2) knowledge chargeable to the application of material prior art; and (3) applicant's failure to disclose the prior art to the PTO with intent to mislead. *Fox Indus., Inc. v. Structural Preservation Sys.*, 922 F.2d 801, 803 (Fed.Cir.1991). A practitioner who acts with reckless indifference to the truthfulness of a representation is chargeable with knowledge of its falsity. 37 C.F.R. 10.23. However, mere gross negligence is not sufficient to justify an inference of intent to deceive by the court. *Baxter Int'l, Inc. v. McGraw, Inc.*, 149 F.3d 1321, 1329-30 (Fed.Cir.1998). Intent generally must be inferred from the sum total of the individual's conduct. *Id.*

If the defendant has made a prima facie case of inequitable conduct, the burden shifts to the patent owner to present evidence which would require reassessment of the validity of the defense. *Paragon* at 1191. If inequitable conduct is found, all the claims of the patent become unenforceable. *J.P. Stevens v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1561, (Fed.Cir.1984).

In this case, T & B argues that George Franks, inventor of the '960 and '074 patents, failed to notify the PTO of the co-pending Graves patent, now held by T & B, in order to

avoid a rejection based on priority of the Graves invention. Moreover, T & B argues that Franks intentionally submitted a false Rule 131 affidavit ("affidavit") to overcome the Patent Examiner's objection and suspension of the '960 patent.

### (A.) MATERIALITY

T & B argues that their co-pending Graves application and the Rule 131 affidavit were both material to the '960 patent application. Information is material if there is a "substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Baxter* at 1327 (*quoting* 37 C.F.R. § 1.56). The court agrees that T & B has presented evidence that both the Graves information and the Rule 131 Affidavit were material to the '960 patent application. Clearly, if Franks had knowledge of true prior art, a central issue to patentability of his invention, it would be material. At the time of application submission, Franks merely had knowledge that Southwestern Bell had been working on an invention that might perform the same task as his own. During the application process, Franks was given a rough drawing of the Graves invention and further materials. When the Examiner was notified of the potential conflict by way of the Information Disclosure Statement by Southwestern Bell, Graves' employer and owner of rights to the invention, the Examiner suspended the '960 patent and administered an interference proceeding. Under 37 C.F.R. 1.56, an inventor may draft claims around a prior patent and withhold knowledge of the prior patent, but here, the Examiner found the Graves invention to be material to determining whether to issue the '960 patent. The initiation of the interference proceeding clearly shows the Examiner found the Graves invention to be important to the '960 patent application and not just unrelated, immaterial information to the patent application. Hence, it is undisputed that the Graves information was material to the '960 patent application.

Moreover, the Rule 131 Affidavit is evidence of materiality. In, *Gen'l Electro Music Corp.*, the court held that, "as a matter of law . . . a false statement in a petition ... is material if . . . it succeeds in prompting expedited consideration of the application." *Gen'l Electro Music Corp. v. Samick Music Corp.*, 19 F.3d 1405, 1411 (Fed.Cir.1994). In *Rohm & Haas Co.*, the court held that "there is no room to argue that submission of false affidavits is not material," concerning the issue of prior art. *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed.Cir.1983). Where a false affidavit is submitted "to overcome the rejection of a patent application, materiality is presumed." *Proctor & Gamble Co. v. Kimberly-Clark Corp.*, 740 F .Supp. 1177, 1197 (D.S.C.1989), *aff'd*, 907 F.2d 159 (Fed. Cir.1990); *see also Donaldson Co. v. Pneumafil Corp.*, 617 F.Supp. 1428, 1441 (W.D.N.C.1985), *aff'd in relevant part*, 824 F.2d 979 (Fed.Cir.1987). During the '960 application process, the Examiner suspended the application to examine whether an issue of interference existed in relation to the Graves application. Franks submitted a Rule 131 Affidavit claiming priority over the Graves invention. During an interference proceeding afterwards, the '960 patent was established as prior art, but without any evidence being offered by Graves. The affidavit, therefore, cannot be shown to be true or false by T & B's evidence, but it does provide relevant evidence of materiality given the resulting, initial withdrawal by the Examiner of his suspension of the application on the basis of Graves' prior art. Regardless of the materiality issue, the court agrees with Senior that intent to deceive cannot be found.

### (B.) INTENT

The next issue with respect to the inequitable conduct determination concerns the determination of whether Mr. Franks intended to mislead or deceive the PTO. This Court finds

that T & B's has failed to raise a genuine issue of fact as to Frank's intent to mislead the PTO. The alleged conduct fails to exhibit sufficient culpability to find intent to deceive.

T & B argues that George Franks, the inventor of the patents at issue, submitted a false affidavit to swear-back the Graves invention in a co-pending application and overcame the Examiner's suspension of the pending application. T & B's alleges that the Graves patent was reduced to practice in 1985– several years before the Franks invention was even conceived– and Franks, therefore, knew his affidavit to be false.

The undisputed facts do not reveal that the Graves patent was in fact reduced to practice in 1985. The Patent Office invited Graves and SWB to initiate the interference process by which they could establish the priority of the Graves invention over Franks' invention if in fact Graves was the prior inventor. After receiving the PTO's letter, SWB and Graves obtained a legal opinion dated April 24, 1989, from Mr. Bernstein on the subject. The opinion was sent to SWB's legal department, and then transmitted to Graves. Mr Bernstein's opinion stated that the Graves clamp was not the prior inventor of Frank's invention and Bernstein advised SWB and Graves of the consequences of not asserting their claim in the proposed interference proceeding. It is undisputed that Mr. Graves failed to dispute anything in the Bernstein affidavit nor did SWB initiate the interference proceedings pursuant to the PTO's letter.

Even if the affidavit were assumed to be false, intent cannot be established to support summary judgment because Senior has provided an explanation for the contention in the affidavit that it had prior art. In *Paragon*, the Court of Appeals stated that if "a bare declaration of lack of intent to mislead where a false material affidavit is submitted to the PTO were to raise a genuine issue, summary judgment would be precluded in all cases except where no response at all is made." *Paragon Podiatry Labs., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1191 (Fed.Cir.1993). The affiant, therefore, must at least present evidence of a plausible explanation or justification for

32

the alleged misrepresentation to prove a genuine issue to overcome summary judgment. *Id.* (*citing* R.56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial").

In the present case, Franks disputes the falsity of the affidavit. Franks contends that he honestly believed that his invention was reduced to practice before the Graves invention, because he believed the Graves invention still had not been reduced to a viable design. At the time of submission, Franks did no more than claim priority at which point the issue was decided by the Examiner. He did not have any evidence other than a rough drawing and claim by Graves to believe that the affidavit information was false. Taking these material facts as true, which we must do for purposes of this motion, it can only be concluded that the evidence at best supports a finding that Franks negligently submitted the affidavit by ignoring the claims by Southwestern Bell and proceeding to hold out his affidavit as clearly true. Even given the affirmative submission of the affidavit and an assumption that the affidavit was false, the evidence does not support a finding of intent to deceive because the same Examiner was examining both applications. It would be difficult to conclude that Franks intended to mislead the Examiner given his knowledge that the Examiner was examining the Graves patent application and had access to information regarding the invention.

Regardless of whether it is false, Franks affidavit did not nullify the issue of priority between the two inventions. The Examiner did eventually administer an interference proceeding to establish priority between the Graves and Franks patents, but Graves did not offer any evidence to establish priority and thus defaulted. The Examiner, therefore, established the Franks patent as prior art. The court does not find this evidence clearly convincing that the Franks invention was truly reduced to practice first and that Franks believed his invention

33

predated Graves when he submitted the affidavit, but it does sufficiently counter T & B's contention that Franks clearly acted with an intent to deceive.

The only other evidence presented by T & B to support a finding of intent is the failure of Franks to disclose the Graves reference in the '960 patent application. At the time of filing the application, Franks knew that Graves had an invention that sought to perform a similar function to his own invention. Furthermore, he received a letter stating that the Graves invention preceded his own by several years and, therefore, had reason to believe the invention might be prior art. Under 37 C.F.R. 1.56, a patent filer has a duty of candor throughout the entire prosecution history. Here, Franks had a duty to notify the Examiner of the alleged conflict pertaining to his application. He failed to do so.

The court acknowledges that a reasonable person would have suspicions regarding priority under the circumstances, but the failure to disclose the information to the Examiner does not sufficiently support a finding of intent. Evidence of actual knowledge of materiality of withheld information is not necessary to find intent to deceive; however, the court cannot find intent based solely on a finding of gross negligence. *Proctor & Gamble Co. v. Kimberly-Clark Corp.*, 740 F. Supp. 1177, 1197 (Fed.Cir.1990). The evidence supports a finding of negligence. Franks knew the Examiner had the Graves application as well as his own. It would, therefore, be inconsistent to argue that Franks believed he could deceive the Examiner by withholding information he already believed the Examiner had received.

Furthermore, Senior argues that Franks had signed the non-disclosure agreement with Southwestern Bell, which precluded him from divulging information. The non-disclosure agreement shows that the Graves invention was not in the public knowledge and therefore supports the argument by Franks that he honestly believed the Examiner would have access to even more information and would be more than able to discover potential conflicts. Our Court of

34

Appeals has stated that blind reliance on the good faith of an individual applying for patent would render examination unnecessary. *Kingsdown* at 874. The court may not substitute an inventor's lack of candor for an examiner's duty to examine the claims. *Id.* Therefore, we can not conclude that the Examiner relied solely on the Franks affidavit, especially given his access to the Graves information. The evidence, therefore, does not support a finding of intent.

In so holding, this court does not condone the withholding of potentially important information where doubt exists and the filing party unilaterally decides that the information should not be considered or other improprieties. This court merely holds that the evidence supports a finding of negligence or gross negligence at best and does not show clear intent to deceive or mislead the Patent Office.

For the reasons set forth above, T & B's motion for summary judgment of unenforceability of the '960 patent due to inequitable conduct is denied and Senior's cross motion to dismiss granted. The court, therefore, does not reach the issue of unenforceability of the '074 patent alleged to be based on the its relationship to the '960 patent. T & B's affirmative defenses claiming laches and estoppel are dismissed for failure to prosecute.

## CONCLUSION

For the foregoing reasons, the Court grants T & B's summary judgment motion on noninfringement of Senior's '960 and '074 patents as to the 40-2000X products is granted (#129-1). The Court also grants T & B's motion for summary judgment as to noninfringement of the SC51 products as to Senior's '960 patent (#123-1). The Court denies T & B's motion for summary judgment as to unenforceability of the two patents based upon alleged inequitable conduct (# 132-1) and grants Senior's cross motion dismissing the inequitable conduct defense

inequitable conduct defense (#157-1).  This case is hereby terminated and any pending motions stricken as moot.  This is a final and appealable order.

**IT IS SO ORDERED.**                    **ENTERED:**

*Ronald A. Guzman*

**Hon. Ronald A. Guzman**
**United States Judge**

DATED: 9/30/02